## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No. |
| | ) | |
| | ) | Count One: 18 U.S.C. § 371 |
| v. | ) | (Conspiracy) |
| | ) | |
| | ) | Count Two: 18 U.S.C. § 201 |
| JAMES MOMON, JR. | ) | (Bribery) |
| | ) | |
| Defendant. | ) | Count Three: 18 U.S.C. § 201 |
| | ) | (Bribery) |
| | ) | |

## INFORMATION

The United States charges:

## COUNT ONE
## 18 U.S.C. § 371
## (Conspiracy)

At all relevant times:

1.     Beginning at least on or about September 21, 2005, and continuing until at least

on or about November 14, 2007, the exact dates being unknown, in Kuwait and elsewhere,

Defendant

## JAMES MOMON, JR.

and others did knowingly, willfully, and unlawfully combine, conspire, confederate, and agree

with others known and unknown to violate a statute of the United States, namely 18 U.S.C. § 201

(bribery), by, among other things, directly and indirectly, corruptly seeking, receiving, accepting,

and agreeing to receive and accept items of value in return for being influenced in the

performance of official acts, including the award of Department of Defense ("DOD") contracts

and blanket purchase agreement ("BPA") calls for bottled water, waste water removal, and other goods and services to co-conspirator government contractors. The unlawful scheme was executed through overt acts taken by MOMON and his co-conspirators.

BACKGROUND

2.    For the purposes of this Criminal Information, the "relevant period" is that period from at least on or about September 21, 2005, until at least on or about November 14, 2007. From on or about September 21, 2005, until on or about August 10, 2006, the Defendant was a Major with the United States Army deployed to Camp Arifjan, Kuwait, as a Contracting Officer. As an Army officer, MOMON was a public official within the meaning of 18 U.S.C. § 201(a)(1).

3.    As a Contracting Officer, MOMON worked on contracts and numerous BPAs, which are indefinite delivery, indefinite quantity procurement vehicles by which DOD agrees to pay a contractor a specified price for a particular good or service. The BPA then allows DOD to order that good or service in whatever quantity, and the contractor is bound by the price agreed upon in the BPA. Requests made under a BPA are referred to as "calls." DOD used BPAs to purchase, among other things, bottled water destined for soldiers serving in Kuwait and Iraq and waste water removal service from Camp Arifjan and other United States military bases in Kuwait. While MOMON was deployed to Kuwait, he made numerous calls on BPAs held by co-conspirator contractors, obligating DOD to pay millions of dollars for goods and services delivered under those calls.

4.    Co-conspirator Contractors One, Two, Three, Four, and Five each operate businesses in Kuwait that contract with DOD. During the relevant period, Co-conspirator Contractors One, Three, Four, and Five each held BPAs for the supply of bottled water. During

the relevant period, Co-conspirator Contractor Two held a BPA for, among other things, the removal of waste water from Camp Arifjan and other United States military bases in Kuwait.

5.    Person A, Person B, and Person C are United States military officials who were deployed to Camp Arifjan, Kuwait, and at various times worked at the Camp Arifjan contracting office. MOMON assumed duties from Person A in or around December 2005, when Person A was redeployed to the United States.

## THE CONSPIRACY AND ITS OBJECTS

6.    Beginning at least on or about September 21, 2005, and continuing until at least on or about November 14, 2007, in Kuwait and elsewhere, MOMON did knowingly, willfully, and unlawfully combine, conspire, confederate, and agree with others known and unknown to, directly and indirectly, corruptly seek, receive, accept, and agree to receive and accept something of value from Co-conspirator Contractors in return for being influenced in the performance of official acts; that is, MOMON agreed to receive and accept approximately $5.8 million, of which he in fact sought, received, and accepted approximately $1.6 million, from Co-conspirator Contractors in return for awarding BPA calls and contracts to Co-conspirator Contractors, in violation of 18 U.S.C. § 201.

7.    The charged conspiracy consisted of a continuing agreement, understanding, and concert of action among MOMON and his co-conspirators, the substantial terms of which were to obtain DOD contracts in return for bribes paid to United States military officers.

## MANNER AND MEANS OF THE CONSPIRACY

It was a part of the conspiracy that MOMON and his co-conspirators would, among other things, do the following:

8.    Agree to pay MOMON a designated amount of money, on a per-case, per-gallon, or per-contract basis, for BPA calls and contracts MOMON would award.

9.    Award BPA calls and contracts to Co-conspirator Contractors, including calls for bottled water, waste water removal, and other goods and services.

10.    Invoice DOD for goods delivered and services provided under the BPA calls and contracts and receive payment from DOD based on these invoices.

11.    Remit payments, in the form of money and other things of value, to MOMON and others, in return for official acts awarding BPA calls and contracts to Co-conspirator Contractors.

OVERT ACTS

In furtherance of the conspiracy and in order to accomplish its objects, the following overt acts, among others, were committed by MOMON or one or more of his co-conspirators in Kuwait and elsewhere:

12.    In or around October 2005, MOMON, Person A, and Person B met in Person A's car to discuss opportunities identified by Person A and Person B for personal profit from contracting actions. During this meeting, Person A and Person B explained to MOMON how to hide those profits in foreign bank accounts and sham companies.

13.    In or around October and November 2005, at the Camp Arifjan dining facility and elsewhere, Person A described to MOMON and Person C how to hide illegal contracting actions from auditors and law enforcement.

14.    In or around November and December 2005, Person A introduced MOMON to Co-conspirator Contractors from whom Person A had received bribes. MOMON and Person A intended for MOMON to take Person A's place in receiving bribes from these Co-conspirator

-4-

Contractors when Person A left Arifjan in December 2005.

A.    Co-conspirator Contractor One

15.    In or around November 2005, MOMON, Person A, and Co-conspirator Contractor One met to discuss an arrangement by which Co-conspirator Contractor One agreed to pay MOMON approximately $0.50 per case of bottled water delivered pursuant to BPA calls MOMON would place on behalf of Co-conspirator Contractor One's companies. Person A expected to receive 50% of MOMON's earnings from these bottled water deliveries.

16.    From in or around January 2006 to in or around July 2006, BPA calls were issued for bottled water deliveries under Co-conspirator Contractor One's company's BPA number W912D1-05-A-0036 obligating DOD to a total payment of at least $8 million.

17.    In or around January 2006, Co-conspirator Contractor One arranged for a corporation named Omega Construction and Support Services to be registered in the United States. The purpose of this company was to provide a means to funnel bribe payments to MOMON without detection.

18.    In or around February 2006, Co-conspirator Contractor One arranged for two Philippine Islands bank accounts to be opened, one for the benefit and use of MOMON and one for the benefit and use of Person C. MOMON and Co-conspirator Contractor One intended to use MOMON's account to receive bribe payments.

19.    In or around February 2006, Co-conspirator Contractor One delivered to MOMON and Person C two ATM cards with access to each Philippine Islands bank account. In or around March 2006, MOMON and Person C attempted unsuccessfully to use those ATM cards to withdraw cash from the accounts.

20.     On or around March 28, 2006, Co-conspirator Contractor One met MOMON at Hartsfield-Jackson Atlanta International Airport and paid MOMON $100,000 cash as partial payment for bottled water BPA calls made by MOMON.

21.     In or around July 2006, Co-conspirator Contractor One met MOMON in Kuwait and paid him $100,000 cash as partial payment for bottled water BPA calls made by MOMON.

22.     In or around July 2006, MOMON delivered some portion of the cash proceeds he received from Co-conspirator Contractor One to the Kuwait home of MOMON's associate, Person D, for safekeeping.

B.     Co-conspirator Contractor Two

23.     In or around November 2005, MOMON and Co-conspirator Contractor Two met to discuss an arrangement by which Co-conspirator Contractor Two agreed to pay MOMON a fixed rate of approximately three cents per gallon of waste water removed from Camp Arifjan pursuant to BPA calls MOMON would place on behalf of Co-Conspirator Contractor Two's company.

24.     From in or around January 2006 to in or around March 2006, BPA calls were issued for waste water removal under Co-conspirator Contractor Two's BPA number W912D1-05-A-0063 obligating DOD to a total payment of at least $3 million.

25.     In or around March 2006, Co-conspirator Contractor Two had approximately $100,000 cash paid into an account controlled by Co-conspirator Contractor One, at MOMON's request, as partial payment for waste water removal BPA calls made by MOMON.

26.     On or about March 29, 2006, Co-conspirator Contractor One wired approximately $110,000 from the receiving account paid by Co-conspirator Contractor Two into the Philippine

Islands bank account designated for MOMON.

27.    In or around March 2006, Co-conspirator Contractor Two had $400,000 cash delivered to MOMON as partial payment for waste water removal BPA calls made by MOMON.

C.    Co-conspirator Contractor Three

28.    In or around December 2005, MOMON, Person A, Co-conspirator Contractor Three, and others met to discuss an arrangement by which Co-conspirator Contractor Three agreed to pay MOMON approximately $1.00 per case of bottled water delivered pursuant to BPA calls MOMON would place on behalf of Co-conspirator Contractor Three's company. Person A expected to receive 50% of MOMON's earnings from these bottled water deliveries. Co-conspirator Contractor Three gave MOMON $10,000 cash to secure the arrangement.

29.    From in or around January 2006 to in or around July 2006, BPA calls were issued for bottled water deliveries under Co-conspirator Contractor Three's BPA number W912D1-05-A-0074 obligating DOD to a total payment of at least $4 million.

D.    Co-conspirator Contractor Four—Bottled Water Contract

30.    In or around December 2005, MOMON, Person A, Co-conspirator Contractor Four, and others met to discuss an arrangement by which Co-conspirator Contractor Four agreed to pay MOMON approximately $1.00 per case of bottled water delivered pursuant to BPA calls MOMON would place on behalf of Co-Conspirator Contractor Four's company. Person A expected to receive 50% of MOMON's earnings from these bottled water deliveries.

31.    From in or around January 2006 to in or around July 2006, BPA calls were issued for bottled water deliveries under Co-conspirator Contractor Four's BPA number W912D1-05-A-0084 obligating DOD to a total payment of at least $15 million.

32.    In or around July 2006, as MOMON prepared to leave Kuwait, Co-conspirator Contractor Four had $800,000 cash delivered to MOMON as partial payment for bottled water BPA calls made by MOMON.

33.    In or around July 2006, MOMON delivered some portion of the cash proceeds he received from Co-conspirator Contractor Four to the Kuwait home of Person D.

E.    Co-conspirator Contractor Four—Lightset Contract

34.    In or around December 2005, MOMON, Co-conspirator Contractor Four, Person A, Person C, and others met to discuss an arrangement by which Co-conspirator Contractor Four agreed to pay MOMON ten percent of the value of a lightset contract MOMON would arrange to be awarded to Co-Conspirator Contractor Four's company.

35.    On January 12, 2006, lightset contract number W912D1-06-P-0281 was awarded to Co-Conspirator Contractor Four's company in the amount of $847,980.

36.    In or around March 2006, Co-conspirator Contractor Four had $80,000 cash delivered to MOMON in return for the award of the lightset contract.

F.    Co-conspirator Contractor Five

37.    In or around January 2006, MOMON and Co-conspirator Contractor Five met to discuss an arrangement by which Co-conspirator Contractor Five agreed to pay MOMON approximately $1.00 per case of bottled water delivered pursuant to BPA calls MOMON would place on behalf of Co-conspirator Contractor Five's company.

38.    From in or around January 2006 to in or around July 2006, BPA calls were issued for bottled water deliveries under Co-conspirator Contractor Five's BPA number W912D1-05-A-0071 obligating DOD to a total payment of at least $20 million.

39.     In or around August 2006, as MOMON prepared to leave his tour in Kuwait, Co-conspirator Contractor Five showed MOMON a spreadsheet detailing approximately $4.2 million owed to MOMON for calls under BPA number W912D1-05-A-0071, which Co-conspirator Contractor Five agreed to pay MOMON when he left military service.

**(All in violation of Title 18, United States Code, Section 371, and pursuant to the extraterritorial venue provision, Title 18, United States Code, Section 3238.)**

**COUNT TWO**
**18 U.S.C. § 201**
**(Bribery)**

Paragraphs 2 through 39 of this Information are incorporated by reference as if fully stated herein, and the following is further alleged:

40.     Beginning at least in or about October 2005, and continuing until at least on or about August 10, 2006, the exact dates being unknown, in Kuwait and elsewhere, Defendant

**JAMES MOMON, JR.**

a public official, directly and indirectly did corruptly seek, receive, accept, and agree to receive and accept something of value in return for being influenced in the performance of official acts; that is MOMON sought, received, accepted, and agreed to receive and accept items of value, totaling approximately $200,000 cash, from Co-conspirator Contractor One in return for the award of bottled water BPA calls to Co-conspirator Contractor One's companies.

**(All in violation of Title 18, United States Code, Section 201(b)(2), and pursuant to the extraterritorial venue provision, Title 18, United States Code, Section 3238.)**

**COUNT THREE**
**18 U.S.C. § 201**
**(Bribery)**

Paragraphs 2 through 39 of this Information are incorporated by reference as if fully

stated herein, and the following is further alleged:

41.    Beginning at least in or about October 2005, and continuing until at least in or about August 10, 2006, the exact dates being unknown, in Kuwait and elsewhere, Defendant

### JAMES MOMON, JR.

a public official, directly and indirectly did corruptly seek, receive, accept, and agree to receive and accept something of value in return for being influenced in the performance of official acts; that is MOMON sought, received, accepted, and agreed to receive and accept items of value, totaling approximately $800,000 cash, from Co-conspirator Contractor Four in return for the award of bottled water BPA calls to Co-conspirator Contractor Four's company.

**(All in violation of Title 18, United States Code, Section 201(b)(2), and pursuant to the extraterritorial venue provision, Title 18, United States Code, Section 3238.)**

DATED: June 25 , 2008, at Washington, D.C.

ON BEHALF OF THE UNITED STATES,

LISA M. PHELAN, Chief
National Criminal Enforcement Section
Antitrust Division

By: _____
EMILY W. ALLEN
MARK W. PLETCHER
FINNUALA KELLEHER
Trial Attorneys
United States Department of Justice
450 5th Street NW, Suite 11300
Washington, DC 20005
(202) 307-0946
emily.allen@usdoj.gov
mark.pletcher@usdoj.gov
finnuala.kelleher@usdoj.gov

WILLIAM M. WELCH II, Chief
Public Integrity Section
Criminal Division

By: _____
PETER C. SPRUNG
ANNALOU TIROL

Trial Attorneys
United States Department of Justice
1400 New York Ave., NW, 12th Floor
Washington, DC 20005
(202) 514-1412
peter.sprung@usdoj.gov
annalou.tirol@usdoj.gov

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No. CR - 08 - 18 |
| | ) | |
| | ) | Count One: 18 U.S.C. § 371 |
| v. | ) | (Conspiracy) |
| | ) | |
| | ) | Count Two: 18 U.S.C. § 201 |
| JAMES MOMON, JR. | ) | (Bribery) |
| | ) | |
| Defendant. | ) | Count Three: 18 U.S.C. § 201 |
| | ) | (Bribery) |
| ———————————————— | ) | |

**FILED**

JUN 2 6 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## PLEA AGREEMENT

Pursuant to Rule 11(c)(1)(A) and (B) of the Federal Rules of Criminal Procedure, the United States of America and the Defendant, JAMES MOMON, JR., agree as follows:

### Plea and Maximum Sentence

1.     The Defendant is entering into this Plea Agreement and is pleading guilty freely and voluntarily without promise or benefit of any kind, other than contained herein, and without threats, force, intimidation, or coercion of any kind. The Defendant knowingly, voluntarily, and truthfully admits the facts contained herein as set forth in Paragraph 7 and in the attached Information, which is incorporated herein by reference.

2.     The Defendant agrees to plead guilty to a three-count Information charging him with one count of conspiracy in violation of 18 U.S.C. § 371 and two counts of bribery in violation of 18 U.S.C. § 201. The Defendant admits that he is guilty of these crimes, that he is pleading guilty because he is guilty, and that he understands that he will be adjudicated guilty of these offenses.

3.     The Defendant understands the nature of the offenses to which he is pleading

guilty and the elements thereof, including the penalties provided by law. The maximum penalties for Count 1 charging him with a violation of 18 U.S.C. § 371 are five (5) years of imprisonment and a fine of $250,000; the maximum penalties for Counts 2 and 3 charging him with a violation of 18 U.S.C. § 201 are 15 years of imprisonment and a fine of $250,000 or not more than three times the monetary equivalent of the thing of value. The Defendant also understands that the Court may impose a term of supervised release to follow any incarceration in accordance with 18 U.S.C. § 3583, and that, in this case, the authorized term of supervised release is at least two years but not more than three years. The Defendant also understands that the Court may order him to pay restitution to the victims and the costs of his incarceration and supervision, and that he will be required to pay a mandatory special assessment of $100 per count of conviction.

4.      If the Court accepts the Defendant's pleas of guilty, and the Defendant fulfills each of the terms and conditions of this Plea Agreement, the United States agrees that it will not further prosecute the Defendant for crimes arising from the facts set forth in Paragraph 7, in the Information, or for crimes disclosed to the United States during briefings conducted pursuant to this agreement. This paragraph does not apply to any "crimes of violence," as that term is defined by 18 U.S.C. § 16, or to any offenses which the Defendant failed to disclose fully to the United States. The Defendant also understands that this Plea Agreement affects only criminal charges and shall not be construed, in whole or in any part, as a waiver, settlement, or compromise of any civil or administrative remedies available to any agency or department of the United States or any state or local government.

5.      The Defendant agrees that if the Court does not accept his pleas of guilty, this Plea Agreement shall be null and void.

-2-

**Advice of Rights**

6.      The Defendant, having been advised of his constitutional rights, including his right to a trial by jury, his right to confront and cross-examine witnesses against him, his right to testify if he so chooses and to call witnesses on his behalf, his right to be represented by an attorney at every stage of the proceedings against him, his privilege against self-incrimination, his right to appeal his conviction, if he is found guilty, and his right to appeal the imposition of sentence against him, knowingly and voluntarily waives these rights and privileges and agrees to enter the pleas of guilty as set forth in this Plea Agreement.

**Factual Basis for Offenses Charged**

7.      Had this case gone to trial, the United States would have presented evidence sufficient to prove the following facts:

(a)      For purposes of this Plea Agreement, the relevant period is that period from at least on or about September 21, 2005, until at least on or about November 14, 2007. From on or about September 21, 2005, until on or about August 10, 2006, the Defendant was a Major with the United States Army deployed to Camp Arifjan, Kuwait, as a Contracting Officer. As an Army officer, the Defendant was a public official within the meaning of 18 U.S.C. § 201(a)(1).

(b)      As a Contracting Officer, the Defendant worked on contracts and numerous BPAs, which are indefinite delivery, indefinite quantity procurement vehicles by which DOD agrees to pay a contractor a specified price for a particular good or service. The BPA then allows the DOD to order that good or service in whatever quantity, and the contractor is bound by the price agreed upon in the BPA. Requests made under a BPA are referred to as "calls." DOD used BPAs to purchase, among other

things, bottled water destined for soldiers serving in Kuwait and Iraq and waste water removal service from Camp Arifjan and other United States military bases in Kuwait. While the Defendant was deployed to Kuwait, he made numerous calls on BPAs held by co-conspirator contractors, obligating DOD to pay millions of dollars for goods and services delivered under those calls.

(c)    Co-conspirator Contractors One, Two, Three, Four, and Five each operate businesses in Kuwait that contract with DOD. During the relevant period, Co-conspirator Contractors One, Three, Four, and Five each held BPAs for the supply of bottled water. During the relevant period, Co-conspirator Contractor Two held a BPA for, among other things, the removal of waste water from Camp Arifjan and other United States military bases in Kuwait.

(d)    During the relevant period, the Defendant conspired with others known and unknown to, directly and indirectly, corruptly seek, receive, accept, and agree to receive and accept money and other things of value in return for being influenced in the performance of official acts. Beginning at least on or around September 21, 2005, and continuing until at least on or around November 14, 2007, the Defendant sought, received, accepted, and agreed to receive and accept cash payments and other things of value from the Co-conspirator Contractors in return for his official acts awarding BPA calls and contracts to those Co-conspirator Contractors. The unlawful scheme was executed through overt acts taken by the Defendant and his co-conspirators.

(e)    During the relevant period, the Defendant, as a public official, directly and indirectly corruptly sought, received, accepted, and agreed to receive and accept things of value in return for being influenced in the performance of official acts. In return for his

-4-

official acts awarding bottled water BPA calls to Co-conspirator Contractor One's companies, the Defendant sought, received, accepted, and agreed to receive and accept approximately $200,000 cash from Co-conspirator Contractor One.

(f)    During the relevant period, the Defendant, as a public official, directly and indirectly corruptly sought, received, accepted, and agreed to receive and accept things of value in return for being influenced in the performance of official acts. In return for his official acts awarding bottled water BPA calls to Co-conspirator Contractor Four's company, the Defendant sought, received, accepted, and agreed to receive and accept approximately $800,000 cash from Co-conspirator Contractor Four.

(g)    During the relevant period, the Defendant, as a public official with DOD, accepted more than one bribe from Co-conspirator Contractors in return for being influenced in the performance of official acts. During the relevant period, the Defendant in fact received and accepted approximately $1.6 million.

## Sentencing Guidelines and Sentencing Factors

8.    The parties agree that the Defendant's sentencing is governed by the November 2007 United States Sentencing Guidelines, and that the controlling Guideline applicable to the offenses to which the Defendant is pleading guilty is U.S.S.G. § 2C1.1. The parties agree that Counts 1, 2 and 3 group pursuant to U.S.S.G. § 3D1.2. The parties agree to recommend the following Guideline calculations:

> 2C1.1(a)(1) Base Offense Level ...................................... 14
>
> 2C1.1(b)(1) Offense Involved More than One Bribe ....................... 2
>
> 2C1.1(b)(2) & 2B1.1(b)(1)(H) Value of Payment More than
>
> > $1,000,000 and less than $2,500,000 ............................ 16

TOTAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

9.    In the event the United States learns of information between the date of this Plea

Agreement and the date of sentencing that, together with the information currently in the

possession of the United States, persuades the United States that such an adjustment would be

appropriate, the United States reserves the right to argue for the application of a 2-level

adjustment under U.S.S.G. § 3C1.1, Obstructing and Impeding the Administration of Justice.

The Defendant reserves his right to oppose any such adjustment.

10.    The Defendant understands that his Criminal History Category will be determined

by the Court after the completion of a Pre-Sentence Investigation report by the U.S. Probation

Office.  Should the Defendant comply fully with his obligations under this Plea Agreement, the

United States will, based on information available as of the date of this Plea Agreement and

subject to satisfactory debriefings at which the Defendant is entirely truthful and fully accepts

responsibility for his criminal conduct and continues to accept responsibility for his criminal

conduct up to and including the sentencing date, recommend a downward adjustment of two (2)

levels for acceptance of responsibility under U.S.S.G. § 3E1.1, or three (3) levels for acceptance

of responsibility under U.S.S.G. § 3E1.1 in the event it is determined that his total offense level

is 16 or higher.  The United States, however, will not be required to make these

recommendations if any of the following occurs: (1) the Defendant fails or refuses to make a full,

accurate and complete disclosure to this office or the probation office of the circumstances

surrounding the relevant offense conduct and his present financial condition; (2) the Defendant is

found to have misrepresented facts to the United States prior to entering this Plea Agreement; (3)

the Defendant commits any misconduct after entering into this Plea Agreement, including but not

limited to, committing a state or federal offense, violating any term of release, or making false

-6-

statements or misrepresentations to any governmental entity or official; or (4) the Defendant fails

to comply with any terms of this Plea Agreement. The parties agree that there exists no

aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into

consideration by the U.S. Sentencing Commission in formulating the Sentencing Guidelines

justifying a departure pursuant to U.S.S.G. §5K2.0.

11.     The Defendant understands and agrees that federal sentencing law requires the

Court to impose a sentence which is reasonable and that the Court must consider the advisory

U.S. Sentencing Guidelines in effect at the time of the sentencing in determining a reasonable

sentence. The Defendant also understands that sentencing is within the discretion of the Court

and that the Court is not bound by this Plea Agreement. The Defendant understands that the

facts that determine the offense level will be found by the Court at sentencing and that in making

those determinations the Court may consider any reliable evidence, including hearsay, as well as

provisions or stipulations in this Plea Agreement. Both parties agree to recommend that the

Sentencing Guidelines should apply pursuant to *United States v. Booker* and that they, along with

the other factors set forth under 18 U.S.C. § 3553, provide a fair and just resolution based upon

the facts of this case. The Defendant also states that he has had ample opportunity to discuss,

and has in fact discussed, the impact of the sentencing guidelines and the statutory maximum

sentence with his attorney and is satisfied with his attorney's advice in this case.

12.     The Defendant acknowledges that the Court has not yet determined a sentence and

that any estimate of a probable sentencing range under the Guidelines that the Defendant may

have received, or may receive in the future, from his counsel, the United States, or the Probation

Office is a prediction, not a promise, and it is not binding on the Probation Office or the Court.

The United States makes no promise or representation concerning the sentence that the

Defendant will receive. The parties understand that the final determination concerning sentencing rests within the sole discretion of the Court. If the Court imposes a sentence with which the Defendant is not satisfied, he will not be permitted to withdraw any guilty plea for that reason nor will he be permitted to withdraw his plea should the Court decline to follow any recommendations by, or stipulations of, the parties.

### Agreement to Cooperate

13.     The Defendant agrees to provide entirely truthful, complete and accurate information, and he agrees to cooperate fully with the United States. This cooperation shall include, but is not limited to, the following:

(a)     The Defendant agrees to be fully debriefed and to attend all meetings, at his own expense, at which his presence is requested, concerning his participation in, and knowledge of, all criminal activities;

(b)     The Defendant agrees to withdraw any assertions of privilege and to provide to the United States all documents and other items or material that may be relevant to the investigation and that are in the Defendant's possession, custody or control;

(c)     The Defendant agrees to waive any privilege that he may have in connection with interviews of, and testimony by, attorney witnesses with information of, or related to, criminal conduct in which he participated or of which he has knowledge. Such waiver does not extend to counsel who now represents the Defendant, in connection with the defense of this criminal matter;

(d)     The Defendant shall not reveal his cooperation, or any information derived

-8-

therefrom, to any person other than his attorney of record in this criminal case without the prior consent of the United States; and

      (e)     The Defendant agrees to testify truthfully at any proceeding in the District of Columbia or elsewhere as requested by the United States.

14.     The United States agrees that, pursuant to U.S.S.G. § 1B1.8, no information provided by the Defendant in debriefings or testimony conducted after the date of, and pursuant to, this plea agreement will be used against him in this case in determining the applicable guideline range for sentencing or as a basis for an upward departure.

15.     The Defendant agrees that the United States may meet with and debrief him without the presence of his attorney, unless the Defendant specifically requests his attorney's presence at such debriefings and meetings. Upon request of the Defendant, the United States will endeavor to provide reasonable advance notice to counsel of the date, place, and time of meetings and debriefings, it being understood that the United States's ability to provide such notice may vary according to time constraints and other circumstances. The United States will accommodate reasonable requests to alter the time and place of such debriefings. It is understood, however, that any cancellations or rescheduling of debriefings or meetings requested by the Defendant that hinder the United States's ability to prepare adequately for trials, hearings or other proceedings may adversely affect the Defendant's ability to provide substantial assistance. Matters occurring at any meeting or debriefing may be considered by the United States in its determination of whether the Defendant has provided substantial assistance or otherwise complied with the letter and spirit of this Plea Agreement, and may be considered by the Court in imposing sentence regardless of whether counsel was present at the meeting or debriefing.

16.    The United States agrees to consider the nature and extent of the Defendant's cooperation in determining whether he has provided substantial assistance to law enforcement authorities pursuant to U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e).  The Defendant acknowledges that the determination of whether he has provided substantial assistance is a decision solely within the discretion of the United States, and the Defendant agrees not to contest that determination.  If the United States concludes that the Defendant has provided substantial assistance to law enforcement authorities pursuant to U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e), the United States will file a motion for a downward departure.   If such a motion is filed, the United States has the right to make a specific recommendation to the sentencing Court regarding the number of offense levels the Court should depart downward in fashioning an appropriate sentence, and the United States will also advise the Court of the full nature, extent and timing of the Defendant's cooperation.

### No Protection for False Statements or Future Criminal Conduct—
### Breach of Plea Agreement

17.    The Defendant shall at all times give complete, truthful and accurate information and testimony, and he agrees not to commit, or attempt to commit, any further crimes.  The Defendant understands that this Plea Agreement does not protect him from prosecution for perjury, should he testify untruthfully at any proceeding, or for making false statements in connection with interviews conducted pursuant to this Plea Agreement or any other statements or testimony on or after the date of this Plea Agreement.  If it is determined that he has failed to provide such complete, truthful and accurate information, the Plea Agreement is voidable at the election of the United States and the United States is no longer bound by the loss or restitution stipulations.  Nor does this Plea Agreement protect him from prosecution for other crimes or

-10-

offenses as to which he does not make full admission and give truthful and complete information. Further, should the Defendant fail to comply with the terms and conditions set forth in this Plea Agreement, the United States may fully prosecute the Defendant on all criminal charges that can be brought against the Defendant.  With respect to such a prosecution:

      (a)    The Defendant shall assert no claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that the Defendant's statements pursuant to this Plea Agreement or any leads derived therefrom should be suppressed or are inadmissible;

      (b)    The Defendant waives any right to claim that evidence presented in such prosecution is tainted by virtue of the statements the Defendant has made; and

      (c)    The Defendant waives any and all defenses based on the statute of limitations with respect to any such prosecution that is not time-barred on the date that this Plea Agreement is signed by the parties.

     18.    In the event of a dispute as to whether the Defendant has knowingly committed a breach of this Plea Agreement, and if the United States chooses to exercise its rights under the preceding paragraph, and if the Defendant so requests, the matter shall be submitted to the Court and shall be determined by the Court in an appropriate proceeding at which the Defendant's disclosures and documents shall be admissible and at which time the United States shall have the burden to establish the Defendant's breach by a preponderance of the evidence.

### Venue

     19.    The Defendant agrees, for purposes of entering his pleas of guilty, sentencing and

-11-

all other appropriate proceedings relevant to the filing of this Plea Agreement, to consent to the

jurisdiction of the United States District Court for the District of Columbia. The Defendant

expressly waives his right to object to venue in the District of Columbia.

### Waiver of Right to Appeal

20.     The Defendant, knowing and understanding the facts set forth herein and in the

Information, including the maximum possible penalty that could be imposed, and knowing and

understanding his right to appeal his conviction and the sentence imposed as provided in 18

U.S.C. § 3742, hereby expressly waives the right to appeal his conviction or any sentence within

the maximum provided in the statute of conviction (or the manner in which that sentence was

determined) on the grounds set forth in 18 U.S.C. § 3742 or on any ground whatever, in

exchange for the concessions made by the United States in this Plea Agreement. The Defendant

also knowingly and voluntarily waives his right to challenge his conviction, the sentence

imposed, or the manner in which the sentence was determined in any collateral attack, including

but not limited to a motion brought under 28 U.S.C. § 2255. This Plea Agreement does not

affect the rights or obligations of the United States as set forth in 18 U.S.C. § 3742(b).

### Right of Allocution

21.     The United States reserves the right to allocate as to the nature and seriousness of

the offense and to make a recommendation as to sentencing. The attorneys for the United States

will inform the Court and the Probation Office of: (1) this Plea Agreement; (2) the nature and

extent of the Defendant's activities with respect to this case; and (3) all other information in its

possession relevant to sentencing.

**Duplicity Waiver**

22.    The Defendant agrees to waive any objection or defense he might have based on the United States joining in a single count, as set forth in Counts Two and Three of the Information, multiple distinct and separate offenses of bribery. The Defendant understands that this waiver is knowingly and voluntarily made after fully conferring with, and on the advice of, his counsel.

**Non-binding on Non-parties**

23.    The Defendant understands that this Plea Agreement binds and limits in any manner only the United States, defined as the United States Department of Justice, Antitrust Division, National Criminal Enforcement Section, and Criminal Division, Public Integrity Section. This Plea Agreement does not bind any United States Attorney's Office, nor does it bind any state or local prosecutor. It also does not bar or compromise any civil or administrative claim pending or that may be made against the Defendant. If requested, however, National Criminal Enforcement Section and the Public Integrity Section will bring this Plea Agreement to the attention of any other prosecuting jurisdiction and ask that jurisdiction to abide by the provisions of this Plea Agreement. The Defendant understands that other prosecuting jurisdictions retain discretion over whether to abide by the provisions of this Plea Agreement.

**Restitution**

24.    Pursuant to 18 U.S.C. § 3663A, the Defendant understands and agrees that restitution to victims of this offense is mandatory. The parties agree that the victim of this offense is the Department of Defense. The loss to the victim is estimated to be approximately $5.8 million, representing the presently known bribe payments received by and promised to the

-13-

Defendant for all contracts and BPA calls fraudulently awarded in Iraq and Kuwait as the result

of the conspiracy and bribery offenses charged in Counts One, Two and Three in the Information.

The Defendant agrees that his restitution obligation shall be joint and several with any other

defendants ultimately convicted in this matter, if any, but that the Court may apportion liability

among defendants, pursuant to the procedures set forth in 18 U.S.C. § 3664(h), to reflect the

level of contribution to the victims' losses and economic circumstances of each defendant. The

parties understand that the Defendant is entitled to argue for offsets based on the amounts paid or

agreed to be paid to the victim by potentially responsible parties. The Defendant agrees not to

transfer or otherwise encumber his assets except with notice to, and consent of, the undersigned

representatives of the United States until such time as this Plea Agreement is filed with the

Court, at which point the Defendant must seek leave of Court to transfer or otherwise encumber

his assets. The parties agree that the Defendant will not be required to obtain the consent of the

United States for property transfers necessary to pay ordinary living expenses and ordinary

business expenses and attorneys' fees. The Defendant agrees as part of this Plea Agreement that

he will provide to the United States detailed financial information about all income and expenses

on a monthly basis and as requested.

## No Additional Agreements

25.    No promises, agreements, or conditions have been entered into other than those

expressly set forth in this Plea Agreement, and none shall be entered into or are binding upon the

Defendant and the United States unless expressly set forth in writing, signed by all parties and

physically attached to this Plea Agreement. This Plea Agreement supersedes any prior promises,

agreements or conditions between the United States and the Defendant.

-14-

## Acknowledgments

**The Defendant**

I, James Momon, Jr., hereby expressly acknowledge the following: (1) that I have read this entire Plea Agreement; (2) that I have had an opportunity to discuss this Plea Agreement fully and freely with my attorney; (3) that I fully and completely understand each and every one of its terms; (4) that I am fully satisfied with the advice and representation provided to me by my attorney; and (5) that I have signed this Plea Agreement knowingly, freely and voluntarily.

6/12/08
DATE

James Momon, Jr.

**Counsel for the Defendant**

I, J. Burkhardt Beale, Esq., attorney for James Momon, Jr., hereby expressly acknowledge the following: (1) that I have discussed this Plea Agreement with my client; (2) that I have fully explained each one of its terms to my client; (3) that I have fully answered each and every question put to me by my client regarding the Plea Agreement; and (4) in my opinion, my client completely understands the letter and spirit of all of the Plea Agreement's terms.

6/12/08
DATE

J. Burkhardt Beale, Esq.

-15-

ON BEHALF OF THE UNITED STATES,

LISA M. PHELAN, Chief
National Criminal Enforcement Section
Antitrust Division

By: _____
EMILY W. ALLEN
MARK W. PLETCHER
FINNUALA KELLEHER
Trial Attorneys
United States Department of Justice
Antitrust Division
National Criminal Enforcement Section
450 5th Street NW, Suite 11300
Washington, DC 20005
(202) 307-0946
emily.allen@usdoj.gov
mark.pletcher@usdoj.gov
finnuala.kelleher@usdoj.gov

WILLIAM M. WELCH II, Chief
Public Integrity Section
Criminal Division

By: _____
PETER C. SPRUNG
ANNALOU TIROL

Trial Attorneys
United States Department of Justice
Criminal Division
Public Integrity Section
1400 New York Ave., NW, 12th Floor
Washington, DC 20005
(202) 514-1412
peter.sprung@usdoj.gov
annalou.tirol@usdoj.gov

-16-